## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JOHN DOE,**

        **Plaintiff,**

                                                 **Case No.: 2:16-cv-171**

**-v-**                                             **JUDGE GEORGE C. SMITH**

                                               **Magistrate Judge Kemp**

**THE OHIO STATE UNIVERSITY,** *et al.*,

        **Defendants.**

### OPINION AND ORDER

Plaintiff John Doe initiated this case against Defendants The Ohio State University ("OSU"), Javaune Adams-Gaston, Kelly B. Smith, J.D., Matthew Page, and Natalie Spiert, (collectively "Individual Defendants").  Plaintiff alleges that he has been harmed by false allegations of sexual misconduct and has brought the following claims against the Defendants: violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, violations of the Fifth and Fourteenth Amendments to the Ohio and United States Constitutions under 42 U.S.C. § 1983, defamation, and intentional infliction of emotional distress.  (Doc. 36, Pl.'s 3rd Am. Compl. (hereinafter "Am. Compl.") ¶ 1).  Plaintiff seeks a declaratory judgment, money damages, and injunctive relief.  This matter is currently before the Court on Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 37).  The matter is now ripe for review.  For the reasons that follow, Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.  Defendants' have also moved to strike the declaration of Joshua Engel which has been fully briefed.  The Motion to Strike is hereby **DENIED**.

## I.    BACKGROUND

### A.    The Parties

Plaintiff John Doe graduated from high school with honors, then obtained an associate degree in nursing from the University of Toledo and became a registered nurse ("RN") in 2009. (Doc. 36, Am. Compl. ¶ 45).  In 2011, John Doe enrolled at OSU to complete his Bachelor's degree with the goal of attending medical school after graduation.  He also worked as an RN at OSU's Wexner Medical Center ("OSUWMC").  (*Id.* at ¶ 46).

Defendant OSU is a public university.  OSU receives federal financial assistance and therefore is subject to Title IX.  (*Id.* at ¶ 153).  Defendant Dr. Javaune Adams-Gaston is OSU's Vice President for Student Life.  Defendant Kelly B. Smith is an Assistant Director of OSU's Office of Student Life.  Defendant Matthew B. Page is an Assistant Director of OSU's Office of Student Life.  Defendant Natalie Spiert is OSU's Student Advocacy Program Coordinator. OSU's Office of Student Life is responsible for enforcing OSU's Code of Student Conduct ("Code of Conduct").  (*Id.* at ¶ 71, Ex. Q).

### B.    OSU's Code of Student Conduct

Section 3335-23-02 of the Code of Conduct (effective date June 18, 2012) defines the jurisdiction and states that it applies to:

> The on-campus conduct of all students and registered student organizations, including conduct using university computing or network resources.  The code also applied to the off-campus conduct of students and registered student organizations in direct connection with:
>
> A.    Academic course requirements or any credit-bearing experiences, such as internships, field trips, study abroad, or student teaching;
>
> B.    Any activity supporting pursuit of a degree, such as research at another institution or a professional practice assignment;

2

      C.      Any activity sponsored, conducted, or authorized by the university or by registered student organizations;

      D.      Any activity that causes substantial destruction of property belonging to the university or members of the university community, or causes or threatens serious harm to the safety or security of members of the university community; or

      E.      Any activity in which a police report has been filed, a summons or indictment has been issued, or an arrest has occurred for a crime of violence.

(Doc. 36-2, Am. Compl. Ex. R ("Code of Conduct") at 1).

The Code of Conduct sets forth a number of actions that constitute prohibited conduct, including sexual misconduct in section 3335-23-04.  (*Id.* at 2–6).  With respect to sexual misconduct the Code of Conduct states:

    **C.**    **Sexual Misconduct** Physical contact or other non-physical conduct of a sexual nature in the absence of clear, knowing and voluntary consent, including but not limited to:

      1.   Non-consensual sexual intercourse, defined as any sexual penetration (anal, oral, or vaginal), however slight, with any body part or object by any person upon any person without consent. Non-consensual sexual contact, defined as any intentional sexual touching, with any body part or object by any person upon any person without consent.

      2.   Sexual exploitation, defined as taking non-consensual, unjust or abusive sexual advantage of another. Examples include, but are not limited to, prostituting another student, non-consensual video or audio-taping of sexual activity, going beyond the boundaries of consent (such as knowingly allowing another to surreptitiously watch otherwise consensual sexual activity), engaging in non-consensual voyeurism, and knowingly transmitting or exposing another person to a sexually transmitted infection (STI) without the knowledge of the person.

      3.   Sexual harassment, as defined in applicable university policy.

      4.   Indecent exposure, defined as the exposure of the private or intimate parts of the body in a lewd manner in public or in private premises when the accused may be readily observed.

For the purposes of this rule, consent shall be defined as the act of knowingly and affirmatively agreeing to engage in a sexual activity. Consent must be voluntary. An individual cannot consent who is substantially impaired by any drug or intoxicant; or who has been compelled by force, threat of force, or deception; or who is unaware that the act is being committed; or whose ability to consent is impaired because of a mental or physical condition; or who is coerced by supervisory or disciplinary authority. Consent may be withdrawn at any time. Prior sexual activity or relationship does not, in and of itself, constitute consent.

(*Id.* at 3–4).

The Code of Conduct sets forth the following with respect to filing a complaint for violation of the Code of Conduct and the hearing procedure:

### 3335-23-06 Filing of complaint and initiation of charges

A written complaint alleging a violation of the code of student conduct should be filed with the university as soon as practicable following the discovery of the alleged violation. Absent extraordinary circumstances, the written complaint must be filed within six (6) months for cases of non-academic misconduct (3335-23-04 (B-Q)), and one (1) month for academic misconduct (3335-23-04 (A)), from the date upon which a university official becomes aware of the alleged violation and identifies the student(s) who allegedly committed the violation. Absent extraordinary circumstances, the university must initiate charges, if any, within one (1) year of the filing of the complaint.

### 3335-23-07 Notice of charges

A. **Notification** Students shall be notified of university charges in writing, unless a more effective form of notification is deemed appropriate. Charges may be presented in person, by placement in a student's residence hall mailbox, by email to the accused student's official university email address (which may direct the student to view the notice on a secure website) or by mail to the accused student's local or permanent address on file in the office of the university registrar.

B. **Current address** All students are required to maintain an accurate and current local and permanent address with the University Registrar.

C. **Meeting with university official** Following notification of charges, students are strongly encouraged to and shall be afforded the opportunity to meet with a university official for the purpose of explaining the university student conduct process and discussion of the charges.

D. **Failure to respond** Failure of the accused student to respond to the initiation of charges or schedule a preliminary meeting shall in no way prevent the

4

university from scheduling and conducting a hearing in the absence of the accused student.

**3335-23-08 Administrative decision**

In all cases, a student charged with one or more violations of the code of student conduct has the right to a hearing. However, in a case where a charged student admits to such violation(s) in writing, the student may request in writing to have a decision as to appropriate action made administratively by a hearing officer rather than have the charges referred to a hearing officer or board for a hearing.  In such situations, the student waives the right to a hearing and the related procedural guarantees provided by a hearing officer or board hearing. Administrative decisions in academic misconduct cases involving graduate students are to be made in consultation with the graduate school. Following an administrative decision, the student retains the right to request an appeal of the original decision, but may do so only upon the ground that the sanction is grossly disproportionate to the violation committed.

(*Id*. at 6–7).  Additionally, the Code of Conduct established the Hearing Procedures and

are as follows:

**3335-23-09 Notice of hearing & request for postponement**

A. **Notice** If a hearing is to be held, written notification will be provided. The notice may be hand delivered; placed into a student's residence hall mailbox; sent by email to the accused student's official university email address, which may direct the student to view the notice on a secure website; or mailed to the last known address of the student, by first class mail, no fewer than ten (10) calendar days prior to the hearing. Unless already provided to the student, the notification will include the charge(s), date, time, and location of the hearing, the designated hearing officer or board, a statement of the student's rights, and information on the hearing procedures.

B. **Postponement** The accused student may request a postponement for reasonable cause or a separate hearing from other accused persons. A request for a postponement for reasonable cause must be made in writing, include supporting rationale, and be received by the person sending the hearing notification at least two (2) business days before the scheduled hearing.

**3335-23-10 Hearing procedures**

Although the procedural requirements are not as formal as those existing in criminal or civil courts of law, to ensure fairness, the following procedures will apply and, unless already provided to the student, be included within the hearing notice:

A. **Attendance** Attendance at hearings is limited to those directly involved or those requested by the hearing officer or board to attend. The hearing officer or board will take reasonable measures to assure an orderly hearing, including removal of persons who impede or disrupt proceedings.

B. **Advisor** The accused student may have an advisor throughout the disciplinary process. The advisor may only counsel the student and may not actively participate in the disciplinary process, unless clarification is needed as determined by the hearing officer or board.

C. **Written statements & witnesses** The accused may: submit a written statement invite relevant factual witnesses to attend, invite character witnesses to submit written statements, , [sic] ask questions of witnesses called by others, and will be notified of potential witnesses to be called. The accused must submit a list of potential witnesses to the hearing officer at least two (2) business days prior to the hearing. The university may present witnesses as well as question those presented by the accused.

D. **Witness absence** The hearing officer or board coordinator may allow written statements if, for good reason, a fact witness cannot attend the hearing.

E. **Consultants** In cases requiring special expertise, the board coordinator may appoint individuals with appropriate expertise to serve as consultants to the board. The consultants may be present and provide information as called upon during the hearing but will not vote.

F. **Standard of evidence** A student will only be found in violation if a preponderance of evidence supports the charges. In the event of a tie, the board will continue to deliberate. If after the board determines that exhaustive deliberations have occurred and a majority decision is not reached, the student will be found not in violation.

G. In cases where prompt review is essential (e.g., when graduation or the end of the academic year is imminent) the accused may be offered the option of an expedited administrative review consisting of an administrative decision or administrative hearing. The accused student may decline such expedited review without the expectation that the process can be completed on an expedited timeline.

(*Id*. at 8).

C.     **The Alleged Misconduct**

John Doe met Jane Doe on September 2, 2012, when she was admitted to the

OSUWMC Emergency Room as a patient.   Jane Doe was brought to the ER by

ambulance because she had fallen and injured her knee as a result of being intoxicated from drinking seven to eight alcoholic beverages.  John Doe was randomly assigned as her nurse.  (Doc. 36, Am. Compl. ¶ 47; Doc. 36-1, Am. Compl. Ex. H, "Case Report").

Jane Doe's friend, who was also intoxicated, accompanied her to the ER.  (Doc. 36, Am. Compl. at ¶ 48).  Jane Doe and her friend were talkative and flirtatious with John Doe, but he remained professional at all times.  (*Id.*).  Jane Doe and her friend tried to give John Doe their phone numbers, but he told them he could not take the numbers.  (*Id.*).  Jane Doe and her friend wrote their phone numbers on the white board in the hospital, but John Doe erased the numbers.  (*Id.*).  When Jane Doe was released, John Doe arranged for transportation and escorted her from the ER in a wheelchair, as he typically arranged for transportation for intoxicated patients.  (*Id.* at ¶ 49).

On the next day, September 3, 2012 at 3:27 pm, Jane Doe sent John Doe a "friend request" on Facebook.  (*Id.* at ¶ 50, Ex. I).  John Doe accepted the request.  (*Id.*).  Jane Doe obtained John Doe's cell phone number from his Facebook page and texted him.[1]  (*Id.*).  Jane Doe and John Doe texted with one another and eventually went on their first date on or about September 22, 2012.  (*Id.* at ¶ 52).  John Doe cooked dinner for Jane Doe at his apartment.  (*Id.*).  Both John and Jane Doe consumed alcohol during the evening.  (*Id.*).  Two of John Doe's roommates were also present at the apartment on the evening of Jane and John Doe's first date.  (*Id.*).  Although John Doe has no recollection, either because he was incapacitated or because the sexual encounter never occurred, Jane Doe asserts that they engaged in physical contact, which included John Doe performing oral sex on Jane Doe.  (*Id.*).  Jane Doe testified that she told John Doe that she did not want him to perform oral sex on her because she was having her period.

---

[1]  There is some dispute as to who contacted whom first.  OSUWMC's report noted that John Doe first texted Jane Doe.  (*See* Doc. 36-1, Am. Compl. Ex. H at 2).

(*Id.*).  Jane Doe testified that John Doe told her he did not care, so the oral sex continued without further objection.  (*Id.* at 52 (citing Doc. 36-2, Am. Compl. Ex. K)).

John and Jane Doe continued dating and were involved in a sexual relationship.  (*Id.* at ¶ 53).  John Doe attached a Valentine's card that Jane Doe gave him in 2013 to illustrate their consensual relationship, the card read:

> [John Doe],
> Thank you for being there for me every single day. I appreciate you so very much.
> I love that I can tell you anything and know that you will understand me. You're
> my best friend. Happy Valentine's Day!
> Love, [Jane Doe]
> xoxo

(*Id.* at ¶ 55, Ex. L).

John and Jane Doe continued dating until the end of the school year, or spring of 2013, because Jane Doe was returning to New Jersey for the summer and John Doe did not want to continue the relationship.  (*Id.* at ¶ 57).  Even though John Doe had ended the relationship, Jane Doe continued to contact John Doe by phone, text, and Facetime.  (*Id.* at ¶ 57).

When Jane Doe returned to school in the fall of 2013, she and John Doe resumed a relationship.  (*Id.* at ¶ 58).  They were friends who had an ongoing consensual, sexual relationship, but they were not "dating."  (*Id.*).  Jane Doe testified at the hearing that she most frequently initiated contact in their relationship, as the following text messages demonstrate:

September 14, 2013

> Jane Doe: What are you going to do for your birthday?
> John Doe: Nothing :( … I'm being forced to work till 11 on Monday morning,
> then I have a mandatory meeting and then hit bed, wake up for a lab?, then back
> to bed to hopefully get up early Tuesday to study for two exams… Not much of a
> birthday due to work How's your day going?
> Jane Doe: What about Sunday or Tuesday?? Please [John]
> John Doe: Tomorrow I work and that's the 16+ hour shift
> Tuesday should work :)
> Jane Doe: Yay!!Tuesday night I'll bring you a cake and celebrate with you!

November 26, 2013

Jane Doe You didn't answer my snap :(
Jane Doe : /
John Doe: O yeah, the naked pictures

December 17, 2013

Jane Doe: You think I'm ugly so your not looking at my snaps??? :(
Jane Doe: Argh
Jane Doe: What. Is. Up.
Jane Doe: Are you still working???...
Jane Doe: This is why I got mad at you last time

(*Id.*).  John and Jane Doe continued to communicate and have a sexual relationship, they often

met up in the evenings after one or the other or both had consumed alcohol.  (*Id.* at ¶ 59).  Jane

Doe sent John Doe naked photographs of her vagina and breasts on May 22, 2013, November 9,

2013, and December 18, 2013.  (*Id.* at ¶ 60, Ex. N).  Additionally, she sent him a text message on

December 26, 2013 that read:

Jane Doe: How's it going stud
John Doe Hi?
Jane Doe: When do you get back? Can we get drunk and be totally freaky? Will
you fuck me stupid when I go back to Ohio

(*Id.* at ¶ 60, Ex. P).[2]

Their consensual sexual relationship continued throughout the 2013–2014 school year,

although their interactions decreased in early 2014 because Jane Doe started dating someone

else.  (*Id.* at ¶ 60).  On April 21, 2014, John Doe invited Jane Doe to his apartment.  Jane told her

new boyfriend that she was going to visit John Doe.  (*Id.* at ¶ 61).  Upon Jane's arrival, they

talked and then engaged in sexual intercourse.  (*Id.* at ¶ 62).  Jane Doe then napped and John Doe

watched television.  (*Id.*).  After Jane Doe woke up, they continued to hang out most of the day,

---

[2]  Contrary to her testimony that she and John Doe had no contact in December 2013, Jane Doe was
communicating with John Doe throughout the fall semester of 2013, as evidenced by the text messages.
(Doc. 36, Am. Compl. ¶ 60, Ex. P).

drinking alcohol and watching movies. (*Id.*). During this visit, Jane and John Doe took a shower together and had a sexual encounter in the shower. (*Id.* at ¶ 63). At varying times, Jane Doe has described the sexual encounter in the shower as "rape," "the motion of sex" and "[sex]."[3] (*Id.*). John Doe has no recollection of taking a shower with Jane Doe. (*Id.*).

At the end of the day and after the effects of the alcohol wore off, Jane Doe shared with John Doe that she loved him, and did not love her boyfriend. (*Id.* at ¶ 64). Jane Doe asked John Doe why he was not doing his part to make the relationship work and why he did not want to date her. (*Id.*). John Doe responded that he cared about her, but was not in a position to have a committed relationship. (*Id.*). He then told Jane Doe that they should not see each other again. (*Id.*). She was upset and expressed regret and concern that she had been with John Doe all day without checking in with her boyfriend. (*Id.*). After Jane Doe left, she contacted John Doe to ask if they could talk the next day, but John Doe refused to communicate with her or see her again because he did not want to mislead her. (*Id.* at ¶ 65).

John Doe graduated from OSU with a Bachelor's degree in Biology in May 2014. (*Id.* at ¶ 67). After graduating, John Doe remained in Columbus, Ohio employed as a full-time RN at OSUWMC working towards his goal of attending medical school. (*Id.*). During the fall semester of 2014, John Doe took a medical terminology class at OSU, which he was eligible to take because he was an OSU employee, but he was not taking this class for credit towards a degree. (*Id.* at ¶ 68).

**D.      OSU's Investigation and Discipline of John Doe**

Seven months after John and Jane Doe's last date, on or about November 20, 2014, Jane Doe contacted OSUWMC to file a complaint, alleging that John Doe had sexually assaulted her

---

[3] The original text in the Amended Complaint reads "sExhibit" but the Court assumes that an unfortunate replace-all error turned instances of "sex." to "sExhibit" based on a similar instance of "sExhibit" in paragraph 56 of the Amended Complaint.

during their sexual encounter in the shower at John Doe's apartment. (*Id*. at ¶ 69). John Doe was informed that a complaint had been filed against him and he was placed on administrative leave on November 20, 2014. (*Id*. at ¶ 70). OSUWMC contacted OSU's Office of Student Life about the complaint and both organizations conducted parallel investigations into the allegations. (*Id*.).

On December 4, 2014, John Doe received a letter from OSU's Office of Student Life that Jane Doe had filed a complaint alleging that he had violated OSU's Code of Student Conduct, specifically sexual misconduct, non-consensual sexual intercourse, endangering behavior, and non-consensual sexual contact in April 2014. (*Id*. at ¶ 71, Ex. Q). The letter directed John Doe to schedule a meeting with Defendant Smith, who was investigating the case. (*Id*.). Defendant Smith instructed John Doe to be prepared "to discuss the incidents involving [Jane Doe] since fall semester 2014 and in particular an incident from April 2014 . . . ." (*Id*. at ¶ 71). Moreover, the December 2, 2014 letter directed John Doe to have no contact with Jane Doe, as follows: "I am directing you to have no contact of any sort with [Jane Doe]. This includes any attempted contact through third parties or electronic means (text, phone, etc.) or through social media (Facebook, Twitter, Instagram, etc.). Failure to follow this directive may result in immediate disciplinary action including interim suspension." (Doc. 36-2, Am. Compl. Ex. Q).

John Doe raised several question regarding the Office of Student Life investigation, including whether they had jurisdiction to investigate because he was no longer a student, the incident did not happen on campus and the complaint was not timely, filed seven months after the alleged incident. (Doc. 36, Am. Compl. at ¶ 74).[4]

---

[4] Ohio State's Student Code of Conduct, Section 3335-23-06, provides that a written complaint must be filed as soon as practicable, but not more than six months after the alleged misconduct, unless extraordinary circumstances exist. (Doc. 36-2, Code of Conduct at 7). Jane Doe's Complaint was filed seven months after the alleged April 2014 incident. (Doc. 36, Am. Compl. at ¶¶ 61, 74).

On December 4, 2014, Defendant Smith met with Jane Doe and her advisor, Defendant Spiert, OSU's Student Advocacy Program Coordinator.  (*Id*. at 77).[5]  On December 18, 2014, John Doe met with Defendant Smith and Brandon Gibbs, the Human Resources representative conducting the investigation on behalf of OSUWMC and cooperated with the investigation into Jane Doe's allegations.  (*Id*. at 76, Ex. T).

Defendant Smith conducted follow-up meetings with Jane Doe and Ms. Spiert on January 16, 2015, and again on February 26, 2015, as well as interviewing Jane Doe's friend on January 27, 2015.  (*Id*. at ¶ 79).  No other interviews were conducted during the investigation.  (*Id*.).

On Friday, February 6, 2015, Defendant Smith sent John Doe a letter via e-mail notifying him of her determination that sufficient evidence existed to charge him under the Code of Student Conduct, and included a Charge & Process Form.  (*Id*. at ¶ 83, Ex. V).  The Charge & Process Form formally charged John Doe with violation of OSU's Code of Student Conduct Sections 3335-23-04(C) Sexual Misconduct; 3335-23-04(C1) Non-consensual sexual intercourse; 3335-23-04(B1) Endangering Behavior; and 3335-23-04(C2) Non-consensual sexual contact.  (*Id*.).  The letter further stated: "Specifically, it is alleged that on two occasions, the first around the middle of September 2012 and the second on April 21, 2014, you violated OSU's Code of Student Conduct in the following manner: Had sexual contact and intercourse with [Jane

---

[5]  Plaintiff generally asserts that Defendant Spiert is biased toward male students and considers them to be sexual predators.  (Doc. 36, Am. Compl. ¶ 77).  Ohio State provides female victims of sexual assault (such as Jane Doe) with trained advocates (such as Defendant Spiert) to serve as their advisors during Ohio State disciplinary proceedings while male students are not provided advisors, in particular advisors who are employed full-time by OSU to serve exclusively as Sexual Violence Support Coordinators. (*Id*. at 78 (citing http://www.titleix.osu.edu/sidebar-resources/response/resources.html; http://sce.osu.edu/about-us.)).

Doe] with[ ]out her affirmative and knowing consent while she was substantially impaired by alcohol consumption." (Doc. 36-3, Am. Compl. Ex. V).[6]

The Charge & Process Form gave John Doe five days to decide to accept responsibility for the charges, or not accept responsibility and request a hearing before the University Hearing Officer or the University Conduct Board. (Doc. 36-2, Am. Compl. ¶ 84). On February 9, 2015, John Doe returned the Charge & Process Form choosing not to accept responsibility for the alleged violations and requesting a hearing before the University Conduct Board. (*Id*. at ¶ 84, Ex. V).

Additionally, Brandon Gibbs concluded his investigation relating to John Doe's employment at OSUWMC and prepared a Case Report stating that OSUWMC would adopt the findings from the University Conduct Board Hearing. (*Id*. at ¶ 85; Doc. 36-1, Case Report).

On February 19, 2015, OSU notified John Doe via email that his University Conduct Board Hearing would take place on Friday, March 6, 2015 at 8:00 a.m., and that Defendant Page would be the coordinator for the hearing. (*Id*. at ¶ 92, Ex. X). He was again notified by email on February 27, 2015, that the hearing packet for his University Conduct Board Hearing was available, notified him that new evidence had been submitted since he last reviewed the file, and stated that he could schedule a time to review the file prior to the hearing. (*Id*. at ¶ 93, Ex. Y). John Doe reviewed the file and discovered that relevant text messages between Jane Doe and her friend were not in the file and Jane Doe's cell phone records were not in the file. (*Id*. at ¶ 94). On March 5, 2015, John Doe requested a one-week continuation of the hearing because of difficulty obtaining some evidence necessary for his defense, including phone and text records to demonstrate that he and Jane Doe had been in contact between late fall 2014 through spring

---

[6] Although not initially alleged, Jane Doe was permitted to amend her complaint and add the additional allegation of sexual assault from their first date in 2012. (Doc. 36, Am. Compl. at ¶ 82).

2015.  (*Id*. at ¶ 95).  Defendant Smith denied the request as being untimely under Section 3335-23-09 of the Code of Student Conduct.  (*Id.*).

On March 6, 2015, the University Conduct Board Hearing was conducted and was recorded via an audio recorder, however John Doe was not permitted to record the hearing.  (*Id*. at ¶ 96).  John Doe's attorney was permitted to serve as his advisor, but was not permitted to "actively participate."  (*Id*. at ¶ 96, (citing Doc. 36-2, Code of Student Conduct at 8)).

John Doe raises a number of challenges regarding the hearing process including that he was not provided a summary of the testimony of the witnesses to be used against him; that Jane Doe's friends offered hearsay testimony; that Jane Doe was permitted to present character witness testimony but that John Doe could not; and that OSU refused to submit John Doe's evidence as part of the file, which included photographs, text messages, and cards demonstrating the couple's ongoing relationship.  (*Id*. at ¶¶ 99–102).

On the same day of the hearing, Defendant Page sent John Doe a letter notifying him of the final outcome of the hearing.  (*Id*. at ¶ 104, Ex. CC).  The Board found that he violated OSU's Code of Student Conduct Sections 3335-23-04(C), (C1), (B1) & (C2); and (b) and issued the following sanction: "You are permanently dismissed from the University beginning March 6, 2015, without the opportunity to reenroll in the future.  Dismissal will be permanently noted on your academic transcript.  You may not enter or be present on any OSU campus or property." (*Id*.).  Additionally, on the same day, John Doe was forced to resign from his position at OSUWMC in an effort to save his career.  (*Id*. at ¶ 97).  Specifically, OSU notified John Doe that he could voluntarily resign or face termination and charges with the nursing board.  (*Id*., Ex. AA).

14

Following the hearing, John Doe repeatedly requested that OSU provide him a copy of the audio recording of the March 6, 2015 hearing, but OSU refused. (*Id.* at 98).

On March 12, 2015, John Doe sent a notice of appeal, permitted under the Code of Student Conduct, to Defendant Dr. Javaune Adams-Gaston, OSU's Vice President for Student Life. (*Id.* at ¶ 115, Ex. S). John Doe's appeal alleged a number of incidents that he claimed constituted anti-male gender bias on the part of Board. (*Id.*). On April 7, 2015, Dr. Adams-Gaston notified John Doe that his appeal was rejected with no explanation. (*Id.* at ¶ 116, Ex. EE).

Plaintiff initiated this case on February 24, 2016, seeking declaratory judgment and damages on his claims for violations of Title IX, including hostile environment sexual harassment and/or discrimination, deliberate indifference, and erroneous outcome; violation of the procedural and substantive component of the Due Process Clause of the Fourteenth Amendment, as well as violation of the equal protection clause of the Fourteenth Amendment. Plaintiff has filed three amended complaints. (*See* Docs. 3, 20, and 36).[7]

## II.   STANDARD OF REVIEW

Defendants bring this motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiff has failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court

---

[7] In addition to the aforementioned factual allegations, many assertions in Plaintiff's Complaint include claims of gender bias and how Plaintiff generally believes gender bias impacted the decisions of OSU.

to draw the reasonable inference that the defendant is liable for the misconduct alleged." A*shcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards.  In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663.  Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint;" a recitation of facts intimating the "mere possibility of misconduct" will not suffice.  *Flex Homes, Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

Plaintiff John Doe alleges that OSU and all the Individual Defendants violated Title IX of the Education Amendments of 1972, by allowing gender bias to motivate the hearing and disciplinary process.  Plaintiff further alleges that during the disciplinary process, the Individual Plaintiffs violated his due process rights and rights under the equal protection clause. Defendants have moved to dismiss all of Plaintiff's claims under each of his theories of liability.

A.      **Title IX Claims**

Counts One through Three of Plaintiff's Third Amended Complaint set forth the

following Title IX causes of action: (1) Violation of Title IX – Hostile Work Environment

Sexual Harassment and/or Discrimination; (2) Violation of Title IX – Deliberate Indifference;

(3) Violation of Title IX – Erroneous Outcome.  The Court will consider each of the claims in

turn.

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent

sexual discrimination and harassment in educational institutions receiving federal funding.  Title

IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any

educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

"Title IX bars the imposition of university discipline where gender is a motivating factor in the

decision to discipline."  *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  Because OSU

is an institution voluntarily participating in federal spending programs, OSU has waived its

Eleventh Amendment immunity for Title IX purposes pursuant to 42 U.S.C. § 2000d-7.

Title IX was enacted to supplement the Civil Rights Act of 1964's ban on racial

discrimination in the workplace and in universities.  Because the statutes share the same

substantive goals and because Title IX mirrors the same substantive provisions of Title VII of the

Civil Rights Act of 1964, courts interpret Title IX by looking to case law interpreting Title VII

employment discrimination cases.  *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984); *see also*

*Horner v. Ky. Athletic Ass'n*, 206 F.3d 685, 689–92 (6th Cir. 2000) (discussing how the United

States Supreme Court has used Title VII analytical framework in cases to interpret Title IX).

The Supreme Court has foreclosed disparate impact claims under Title VII.  *See Alexander v.*

*Sandoval*, 532 U.S. 275, 280 (2001).  Although Title IX prohibits intentional gender

discrimination, it does not support claims of disparate impact.  *Id.* (stating that "proof of intent

. . . is the *sine qua non* to compensatory relief for any type of Title IX violation.").

When determining whether a plaintiff was able to demonstrate that intentional gender

discrimination occurred in a university disciplinary proceeding, the Sixth Circuit Court of

Appeals utilizes the analytical framework provided in *Yusuf*.  *See Doe v. Cummins*, 662 F. App'x

437, 451–52 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003).  In

*Yusuf*, the Second Circuit Court of Appeals found that Title IX claims arising from disciplinary

hearings can generally be challenged under two categories: erroneous outcome and selective

enforcement.  *Yusuf*, 35 F.3d at 714–15.  Under either standard, a plaintiff must show that gender

bias was the source of the deprivation.  *Id.* at 715; *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774,

778 (S.D. Ohio 2015) (noting Title IX's prohibition against discrimination "on the basis of sex")

(Dlott, J.).  The plaintiff in *Mallory* also asked the Sixth Circuit to adopt two additional standards

for analyzing whether disciplinary proceedings violate Title IX's prescription against intentional

discrimination: deliberate indifference and archaic assumptions.  *Mallory*, 76 F. App'x at 638–

39.  Although the *Mallory* Court did not specifically determine whether it would adopt the

deliberate indifference and archaic assumptions standards, the Court provided no analysis of

Plaintiff's claims under either standard.  *Id.*

### 1.  Hostile Work Environment Sexual Harassment and/or Discrimination

Plaintiff John Doe alleges that OSU's policies with respect to the adjudication of campus

sexual assaults claims fail to meet the standards required by Title IX.  He asserts that

"Defendants have created an environment in which male students accused of sexual assault, such

as John Doe, are fundamentally denied due process as to be virtually assured of a finding of

guilty.  Such biased and one-sided process deprives male OSU students like John Doe of educational opportunities on the basis of sex." (Doc. 36, Am. Compl. ¶ 161).  Additionally, he states that "OSU's investigation and/or discipline of John Doe is discriminatory and based upon or motivated by John Doe's male gender." (*Id*. at ¶ 165).  Further, Plaintiff alleges in this claim that OSU acted with deliberate indifference and made an erroneous outcome in violation of Title IX which will be addressed in turn. (*Id*. at ¶¶ 168-169).[8]

As discussed above, "[b]ecause Title IX itself fails to provide an analytical framework for gender discrimination claims, the Sixth Circuit has opted to apply the *McDonnell Douglas* burden shifting analysis used in Title VII employment discrimination cases." *Edmunds v. Bd. of Control of E. Mich. Univ*., No. 09-11648, 2009 WL 5171794, at *7 (E.D. Mich. Dec. 23, 2009) (citing *Ivan v. Kent State Univ*., 92 F.3d 1185, 1996 WL 422496, at *2 (6th Cir. July 26, 1996) (table)).  Therefore, in order for John Doe to maintain a gender discrimination claim under Title IX, he must sufficiently plead that: (1) he is a member of a protected class; (2) he was subjected to adverse action by OSU: (3) he was qualified for the opportunity that was denied; and (4) that a comparable non-protected person received better treatment. *Id*.  With respect to the last requirement, to demonstrate that he was treated differently than a similarly situated person of the

---

[8]  To the extent Plaintiff is alleging a claim of selective enforcement pursuant to Title IX, that claim fails. "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Cummins*, 662 F. App'x at 452 (citations omitted).  Plaintiff, here, has failed to assert any allegations that a female student was not disciplined by OSU after a complaint was filed for violation of the Code of Conduct similar to the allegations made against Plaintiff in this case.  Plaintiff's allegations that Jane Doe was treated more favorably during the disciplinary action against him are insufficient to maintain a selective enforcement claim because Jane Doe was not similarly situated to Plaintiff. *See Doe v. Case Western Reserve Univ*., No. 1:14-CV-2044, 2015 WL 5522001, at *6 (N.D. Ohio Sept. 16, 2015) ("Jane Roe, the complainant against Plaintiff in the disciplinary proceedings, is not a counterpart for the purposes of a selective enforcement claim." (citation omitted)).  To state a selective enforcement claim, a plaintiff must "identif[y] . . . a comparator of the opposite sex who was treated more favorably by the educational institution *when facing similar disciplinary charges*." *Id*. (citing *Yusuf*, 35 F.3d at 716) (emphasis added).  Plaintiff's conclusory allegations are therefore insufficient to maintain a claim for selective enforcement under Title IX.

opposite gender, John Doe must demonstrate that "all relevant aspects" of his situation are "nearly identical" to those of the allegedly similarly situated person.  *Humenny v. Genex Corp.*, 390 F. 3d 901, 906 (6th Cir. 2004).

In the case at bar, Defendants argue that John Doe cannot satisfy all elements of the above test and, thus, cannot establish a prima facie case of gender discrimination under Title IX. Specifically, with respect to elements two and three, Defendants argue because John Doe was not a student at OSU at the time of the hearing, he cannot claim adverse action based upon his "dismissal."  And Defendants argue that the same analysis applies to the issue of whether he was "qualified" for the opportunity of being a student.  Again, John Doe had already graduated and obtained a degree.  He has not alleged that he was applying to take any more classes.  Further, Defendants assert that John Doe has not identified a single female student whose situation was "nearly identical" to his, but who was not dismissed from OSU on a similar set of operative facts.  John Doe does not identify any female who was accused of violating the Code of Student Conduct, who was accused of non-consensual sexual contact under a similar set of operative facts as him, who went through a full investigation and hearing process, and who was either adjudicated not responsible or who was not dismissed.  (Doc. 37, Defs.' Mot. at 14).

Plaintiff counters that the *McDonnell Douglas* burden shifting analysis should not be applied to a motion to dismiss a Title IX claim, and even if it is applied, that he can establish the necessary elements.  (Doc. 40, Pl.'s Resp. at 42).  John Doe asserts that he suffered an adverse action and is qualified to bring a Title IX claim because he received a "permanent dismissal" notation on his academic transcript and has been forever prohibited from enrolling at OSU or entering "any OSU campus or property."  (*Id.*, (citing Doc. 36, Am. Compl. ¶ 104, Ex. CC)). Further, he argues that he has presented multiple examples of how similarly situated females are

20

treated differently at OSU.  (Doc. 40, Pl.'s Resp. at 42, (citing Doc. 36, Am. Compl. ¶¶ 20–21, 111, 129, 135, 170, and 214)).

The Court agrees with Plaintiff's contention that the *McDonnell Douglas* test should not be applied rigidly at this stage.  "*McDonnell Douglas*. . . is an evidentiary standard, not a pleading requirement."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002).  The Supreme Court "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."  *Id.* at 511.

Plaintiff John Doe has sufficiently pled that he suffered an adverse action, including a permanent dismissal and prohibition from ever enrolling at OSU or entering any OSU campus or property, as well as his forced resignation from his job.  And with respect to the last element, Plaintiff has generally alleged that similarly situated females at OSU are treated differently, citing many examples of cases including some cited in *Waters v. Drake*, 105 F. Supp. 3d 780, 804–05 (S.D. Ohio 2015) (analyzing comparators of band director including cheerleading coach) (Graham, J.); (Doc. 36, Am. Compl. ¶¶ 20–21).  He further contends that both he and Jane Doe were similarly situated "because they were both students at OSU who consumed alcohol prior to engaging in physical contact with another student who consumed alcohol."  (Doc. 36, Am. Compl. ¶ 111).  The Court acknowledges Plaintiff's arguments with respect to Jane Doe and they have some similarities because they were in a relationship, however, there is no allegation that Jane Doe was ever accused of violating the Code of Student Conduct and then not dismissed from OSU.  Courts faced with similar circumstances have found that the "complaining student" in the disciplinary proceedings is not a comparator to the accused student for purposes of a Title IX gender discrimination claim.  *Doe v. Case W. Reserve Univ.*, No. 1:14-cv-2044, 2015 WL

5522001, *6 (N.D. Ohio Sept. 16, 2015).  Nonetheless, because Plaintiff has not specifically

identified a female student who was accused of violating OSU's Code of Student Conduct and

was not dismissed from OSU, the Court finds that Plaintiff has not sufficiently pled a claim for

Title IX hostile environment/sexual harassment.

Further, as noted above, based on *Mallory* and *Cummins*, the Sixth Circuit appears to

have recognized the "erroneous outcome" and "selective enforcement" categories of Title IX

claims in the disciplinary context, but not a separate "hostile environment" theory of Title IX

liability in the disciplinary proceeding context absent allegations of sexual harassment.

Therefore, to the extent Plaintiff is also alleging a hostile working environment sexual

harassment claim, his allegations are insufficient to maintain such a claim.  *See Doe v. Salisbury*

*University*.  *Compare* 123 F. Supp. 3d 748, 764–65 (D.Md. 2015) (finding that allegations that

the university investigated and disciplined the plaintiff's alleged sexual assault without proper

jurisdiction, the university's employees lacked proper training to investigate and/or discipline

pursuant to Title IX, the university's policies were biased against men in violation of Title IX

and due process were insufficient to state a claim for "harassment" for purposes of bringing a

hostile environment sexual harassment claim).

### 2.    Deliberate Indifference

Plaintiff's second Title IX claim alleges that "OSU employees . . . acted with deliberate

indifference towards John Doe because of his male gender," and failed to remedy "OSU's

violations of John Doe's rights under OSU's policies, Title IX and/or guidance promulgated by

ORC" and further by "OSU's erroneous determination that John Doe violated OSU's policies

which OSU adopted pursuant to federal laws and regulations related to Title IX."  (Doc. 36, Am.

Compl. ¶¶ 173–174).

The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment. *See Mallory*, 2003 76 F. App'x at 638–39 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998)).  To maintain a claim for deliberate indifference under Title IX, Plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Id*. at 638.  The Sixth Circuit has not determined that these Title IX standards, which were developed in sexual harassment cases and cases involving unequal athletic opportunities, are applicable when a plaintiff like John Doe in this case claims that intentional gender discrimination occurred in a university disciplinary proceeding. *Id.*at 639–42 (providing no analysis of the plaintiff's claims under either standard).  Further, the law is not clear as to what constitutes a properly plead deliberate indifference claim under Title IX. *See Sahm*, 110 F. Supp. 3d at 778, n.1 ("At least one district court in the Sixth Circuit has held that [] sexual harassment is a 'critical component' of a Title IX deliberate indifference claim. *See Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757–58 (E.D. Tenn. 2009).  A sister court in the Southern District of Ohio . . . did not limit the deliberate indifference theory to only sexual harassment cases." (citing *Wells v. Xavier Univ.*, 7 F. Supp. 3d. 746, 751–52, n.2 (S.D. Ohio 2014) (Spiegel, J.))).

In this case, John Doe alleges the "misconduct" to be a "violation of [his] rights under OSU's policies" because of his "male gender."  (Doc. 36, Am. Compl. ¶¶ 173–174).  Defendants argue that they complied with internal policies and procedures in investigating and adjudicating the complaint of sexual misconduct against John Doe.  They contend that he is merely unhappy with their decision and is seeking review by this Court of the University's decision.

In opposition to Defendants' motion, Plaintiff generally asserts that certain actions by OSU constitute gender bias, however, he has not actually provided specific facts upon which he can rely to support his Title IX claims.  He generally asserts that OSU's disciplinary proceedings, including providing the female complainant with a paid university advisor, allowing the female complainant to continue to change her story, not allowing him, a male, an extension or including his evidence in the records, among other things, were influenced by gender bias and that OSU discriminated against him on the basis of gender in violation of federal law.  Plaintiff has not alleged that he complained to OSU that he was being sexually harassed, nor is there any allegation that OSU ignored his complaints of sexual harassment.  As actual notice of the alleged discrimination is an essential element of a deliberate indifference claim, his claim fails.  *See Gebser*, 524 U.S. at 290; *see also, Williams ex rel Hart v. Paint Valley Local Sch. Dist.*, 400 F. 3d 360, 366 (6th Cir. 2005).

Even without pleading an element of sexual harassment, Plaintiff has still failed to sufficiently plead a deliberate indifference claim under Title IX.  He has not alleged sufficient facts demonstrating intentional discrimination against him on the basis of his gender with respect to the investigation, the hearing, or the penalty imposed by OSU.  He has not alleged that he complained to an OSU official that he was being subjected to gender discrimination during the course of the investigation and hearing, nor has he alleged that any OSU official had "actual knowledge" that the investigation and hearing were discriminatory in any way or that OSU failed to take remedial action.  When faced with similar facts, that a plaintiff's allegations (or lack thereof), courts have held that the plaintiff failed to state a claim for Title IX deliberate indifference.  *Case W. Reserve*, 2015 WL 5522001 at *7.  Allegations of deliberate indifference fail where Plaintiff fails to allege any specific facts to support a claim of deliberate indifference

based upon gender discrimination, but, instead makes only conclusory allegations of gender bias.

*Id.* As stated by the court:

> Plaintiff points to procedural defects in the disciplinary hearings as evidence of discriminatory bias. The Complaint also alleges that CWRU's decision was 'discriminatory, presumptive and/or arbitrary and capricious' based on the hostile attitude of the UJB towards Plaintiff during proceedings. While these pleadings may call to question the outcome of the proceedings, they are not factual allegations supporting the conclusion that the procedural flaws and hostility towards Plaintiff were motivated by sexual bias.

*Id.* at *9-10.

Just as in *Case Western Reserve*, Plaintiff's pleadings may call into question the ultimate outcome of the disciplinary proceedings, however, other than conclusory allegations, Plaintiff fails to plead a claim that OSU's disciplinary process is discriminatory. Accordingly, Plaintiff's Title IX deliberate indifference claim is hereby dismissed.

### 3. Erroneous Outcome

Plaintiff John Doe's third Title IX claim alleges that OSU made an "erroneous determination that John Doe violated OSU policies" and "unlawfully disciplined John Doe because of his male gender." (Doc. 36, Am. Compl. ¶¶ 179, 182). Defendants argue that Plaintiff's Complaint contains mere conclusory allegations and he has failed to sufficiently plead a claim for erroneous outcome under Title IX.

An erroneous outcome claim exists when an "innocent" person was wrongly found to have committed an offense because of his or her gender. *Sahm*, 110 F. Supp. 3d at 777–78 (citing *Yusaf*, 35 F.3d at 715). In order to state a claim for "erroneous outcome" under Title IX, a plaintiff must plead two elements: (1) facts sufficient to cast doubts about the accuracy of the outcome of the disciplinary hearing; and (2) a causal connection between the flawed outcome and gender bias. *Id.* Therefore, in this case, Plaintiff must demonstrate that Defendants' actions

were "motivated by sexual bias" and that OSU's "disciplinary hearing process constitutes a 'pattern of decision-making' whereby the . . . disciplinary procedures governing sexual assault claims [are] 'discriminatorily applied or motivated by a chauvinistic view of the sexes.'"  *Case W. Reserve*, 2015 WL 5522001, *5 (quoting *Univ. of the S.*, 687 F. Supp. at 756).  In order to properly state a claim alleging that Defendants' actions were motivated by sexual bias, Plaintiff cannot rely on mere conclusory allegations or claims with no factual support.  Instead, such allegations must include, ". . . *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Id*. at *6 (quoting *Yusuf*, 35 F. 3d at 715).  "However, a single case by an individual who was displeased by the result of a disciplinary proceeding cannot constitute a pattern of decision-making."  *Id*.

In this case, Defendants argue that Plaintiff has not included any alleged statements made by members of the Student Conduct Disciplinary Panel, who decided his case, which would indicate any decision making was "influenced by gender."  Plaintiff's only allegations in this regard are that the panel "ask[ed] questions . . . downplaying facts proving Jane Doe initiated physical contact with John Doe," "coax[ed] Jane Doe to provide testimony that reinforced gender biased stereotypes," and "allowed Jane Doe to make an impact statement about the alleged misconduct before making any determination of whether a rule was violated."  (Doc. 36, Am. Compl. ¶ 103).

Plaintiff counters that indirect/circumstantial evidence of gender bias can trigger Title IX liability, including that pressure from the executive branch of the Federal government motivated the discipline of John Doe.  In support of this, Plaintiff offers the temporal connection between the United States Department of Education's Office of Civil Rights ("OCR")'s investigation of

OSU and OSU's investigation of John Doe.  (Doc. 40, Pl.'s Resp. at 7).  OSU ultimately entered

into a settlement with OCR and documentation relating to this settlement states that "since 2013,

OSU had permanently expelled every student found guilty of sexual assault" and that "[u]pon

information and belief, all of these students were male."  (*Id*. at 8, (citing Doc. 36, Am. Compl.

¶ 25).  Plaintiff also references in the same document OSU's promise to continue to aggressively

discipline male students accused of sexual misconduct.  (*Id*.).

Plaintiff further references in support *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572–

73 (D. Mass. 2016), recognizing that universities across the country have adopted "procedural

and substantive policies intended to make it easier for victims of sexual assault to make and

prove their claims and for the schools to adopt punitive measures in response."  The *Brandeis*

court noted that Harvard University adopted a similar policy on sexual harassment similar to the

policy at issue in *Brandeis*.  *Id*. at 573.  In response to the Harvard policy:

> 28 members of the Harvard Law School faculty issued a statement voicing their "strong objections" to the policy.  *Id*.  Among other things, the statement concluded that 'Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'  *Id*.  It called upon Harvard to 'begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community.'  *Id*.
>
> The goal must not be simply to go as far as possible in the direction of preventing anything that some might characterize as sexual harassment.  The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom.
>
> Like Harvard, Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process.  And it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past.  Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.  Each case must be decided on its own merits, according to

27

its own facts.  If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.

Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion.

*Brandeis*, 177 F. Supp. 3d at 573.

Plaintiff further provides a "Tip of the Week" published by the Association of Title IX

Administrators ("ATIXA") regarding alcohol-involved sexual encounters:

A common policy problem comes from failing to distinguish between intoxicated and incapacitated.  Yet, the most serious issue comes from failing to implement a mens rea, if you will, within the definition.  Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not an offense, there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation . . . ***there has to be something more than an intent to have sex to make this an offense.  Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so.  Without a knowledge standard, a respondent will suffer an arbitrary and capricious application of the college's rules***.

(Doc. 36, Am. Compl. ¶¶ 27–29, 117, Ex. FF) (emphasis in original).

Plaintiff argues that he has pled facts sufficient to cast doubts about the accuracy of his

disciplinary hearing and a causal connection between the flawed outcome and gender bias.

Plaintiff has pled conclusory allegations of gender bias.[9]  Defendants argue, and the Court agrees

that Plaintiff's Complaint fails to identify any specific statement(s) by the disciplinary panel

which evidence gender bias in the decision making process.  Nor are there any allegations of

---

[9]  Plaintiff references six cases in support of his erroneous outcome claim in which courts have rejected motions to dismiss the plaintiffs' Title IX claims:  (Doc. 40, Pl.'s Resp. at 36–37) (citing *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016); *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201 (S.D. Ind. 2016); *Doe v. Washington and Lee*, No. 6:14-CV-52, 2015 U.S. Dist. LEXIS 102426 (W.D. Va. Aug. 5, 2015); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015); and *Doe v. Bd. of Regents of the Univ. Sys. of Ga.*, 215 Ga. App. 684 (Ga. Ct. App. 1994)).

statements by "pertinent university officials" demonstrating gender bias in the Student Conduct process.  Plaintiff generally references statements made by Defendant Natalie Spiert, who was Jane Doe's student advocate.  Ms. Spiert gave a "talk about 'Sexual Assault on College Campuses,'" on TEDx, wherein she described statistics and facts regarding sexual assaults on college campuses.  (Doc. 36, Am. Compl. ¶ 77).  However, her comments were general and not specific to Plaintiff's case.  Nor is there any allegation that she was a "pertinent university official" who had the authority to control the investigation or adjudication of Jane Doe's claim. She was merely an advisor to Jane Doe.

In the case at bar, Plaintiff certainly alleged facts that cast doubt on the accuracy and ultimate outcome of the disciplinary proceeding against him.  John Doe has submitted significant evidence to establish that he and Jane Doe were in a relationship for over 18 months.  Further, the timing of the complaint against John Doe, seven months after the alleged incident of sexual misconduct, the decision to allow the victim to amend her claims during the proceeding, and the fact that John Doe ended the relationship all raise questions as to whether John Doe committed a violation of the Student Code of Conduct.  Additionally, OSU has affirmatively stated that it promises to continue to aggressively discipline male students accused of sexual misconduct with no reassurance of ensuring fairness and due process in the disciplinary process.  *Cf. Wells*, 7 F. Supp. 3d at 751 (finding the plaintiff pleaded facts sufficient to cast doubts on the accuracy of a disciplinary proceeding by alleging that the defendants rushed to judgment, failed to train the disciplinary hearing panel, ignored a prosecutor's request to hold off on proceedings until a criminal investigation concluded, ignored a prosecutor's opinion that a sexual assault did not occur, denied the plaintiff access to counsel, and denied the plaintiff witnesses); *Case W. Reserve*, 2015 WL 5522001 at *5 (finding that the plaintiff pleaded facts sufficient to cast doubts

on accuracy of a disciplinary proceeding outcome by alleging that the defendant pressured a student to provide evidence against the plaintiff during an appeal, did not allow the plaintiff to review that evidence, denied the plaintiff the opportunity to cross examine his accuser during the disciplinary hearing, and treated the plaintiff in a hostile manner during that hearing).

However, the second element of the erroneous outcome claim remains, i.e. has Plaintiff sufficiently pled a causal connection between the flawed outcome and gender bias? Plaintiff has made some general allegations of gender bias and cited numerous cases from across the country that faced similar issues.[10] There is little doubt that universities around the country have felt pressure to tighten the investigation and punishments in sexual misconduct cases because this is a very sensitive issue. However, there are genuine concerns raised in these cases and general publications regarding how universities are handling the investigations. The organization charged with administering Title IX, ATIXA, has stated that when college students are getting drunk and having sex, it is the men who are being punished because their partners are having sex too and not being subject to the code of conduct for doing so, constituting gender discrimination. (*See* Doc. 36, Am. Compl. ¶¶ 27–29, 117, Ex. FF); s*ee also*, *Brandeis*, 177 F. Supp. 3d at 573 ("The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline . . ."). However, despite Plaintiff's repeated argument that Jane Doe's allegations were false and an act of revenge because John Doe ended their relationship (Doc. 40, Pl.'s Resp. at 2–5), it is not the role of this Court to make a determination as to Jane Doe's claims. *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion.")

---

[10] Plaintiff has not provided specific arguments with respect to each of the Title IX claims, but instead offers in Section (B)(1)(a)-(c) of his response that the unlawful discipline against him was motivated by three separate categories of gender bias. (Doc. 40, Pl.'s Resp. at 6-27).

Plaintiff alleges in his Complaint that OSU has displayed a pattern of anti-male gender bias.  Plaintiff has enumerated 20 examples of alleged anti-male gender bias in his responsive pleading including the *Waters v. Drake* decision, 105 F. Supp. 3d 780, and another case before this Court brought by Attorney Josh Engel, *John Doe v. OSU*, Case No. 2:15-cv-2830 (the "*Engel* Case"), and OSU's training materials regarding consent and sexual assault which Plaintiff alleges illustrate gender bias against male students.  (*See* full list in Doc. 40, Pl.'s Resp. at 16–19).  Plaintiff contends that the timing of the *Waters* and *Engel* cases could have impacted the treatment of John Doe's case.  The complaint in *Waters* was filed in September 2014, less than two months before OSU charged John Doe with sexual misconduct.  Although *Waters* was ultimately dismissed on summary judgment, the case and the general allegations surrounding it—that OSU and the OSU marching band tolerated a sexualized environment on campus—were highly publicized.  There is a strong possibility, as alleged by Plaintiff, that these lawsuits could have impacted John Doe's disciplinary process.  Therefore, based on all of the above referenced allegations, at this stage in the proceedings, Plaintiff has made sufficient general allegations of gender bias in cases similar to his to suggest there is discrimination in the investigation and hearing process of sexual misconduct cases.  *See Collick v. William Paterson Univ.*, No. 16-471, 2016 U.S. Dist. LEXIS 160359, at *35 (D. N.J. 2016) ("Whether such allegations are true (or can survive summary judgment) remains an open question.  At the pleading stage, however, an allegation that the process was one-sided, irregular, and unsupported by evidence may give rise to an inference of bias).[11]  Plaintiff has therefore sufficiently pled a claim of erroneous outcome under Title IX and put Defendant on notice of his claim.

---

[11]  The Court acknowledges that as recognized in *Doe v. Columbus Univ.*, 831 F.3d 46, 57 (2nd Cir. 2016), "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by

**B.**     **Section 1983 Claims**

In Counts Four and Five of the Amended Complaint, Plaintiff alleges violations of procedural and substantive due process and equal protection, brought pursuant to 42 U.S.C. § 1983. Section 1983 confers a right of action against any person who, acting under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution or federal law. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 3 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir. 1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived plaintiff of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360–61 (6th Cir. 1988); 42 U.S.C. § 1983.

The Sixth Circuit plainly has "held that the Due Process Clause is implicated by higher education disciplinary decisions." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (citing *Goss v. Lopez*, 419 U.S. 565 (1975); *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)); *see also Cummins*, 662 F. App'x at 445 (recognizing that due process "protections apply to higher education disciplinary decisions"). Additionally, in the academic setting, courts have found that due process requires that: 1) the student be informed of their academic situation; and 2) the decision must be careful and deliberate. *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 (1978). Here, Plaintiff alleges that the individual defendants violated his substantive

---

bias." However, it may not "necessarily relate to bias on account of sex." *Id.* Therefore, although difficult to distinguish at this stage, it is possible that OSU was biased in favor of the alleged victims of sexual assault cases and against the alleged perpetrators, but courts have held that this is not the same as demonstrating bias against male students. *See Bleiler v. Coll. of Holy Cross*, No. 11-11541, 2013 U.S. Dist. LEXIS 127775 (D. Mass. Aug. 26, 2013); *see also King v. DePauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males, even if all of the students accused of assault were male); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination").

and procedural due process rights under the United States Constitution.  Defendants argue that Plaintiff has failed to establish any protected life, liberty, or property interests upon which to base his claims for violation of procedural and substantive due process protections under 42 U.S.C. § 1983.  And, even if he could establish a property interest, he was afforded more process than constitutionally due.  The Court will address these arguments in turn.

### 1.  Life, liberty, or property interest

Plaintiff must first establish the existence of a constitutionally protected life, liberty, or property interest regardless of pursuing a procedural or substantive due process claim.  *See Easley. Univ. of Mich. Bd. of Regents*, 627 F. Supp. 580, 582 (E.D. Mich. 1986) (a plaintiff "cannot prevail under either theory [procedural or substantive due process] without first proving his entitlement to a property interest protected by due process.").  Defendants argue that Plaintiff has no protected property interest because he was not enrolled as a student at OSU at the time of adjudication of his claim.

The United States Supreme Court has refrained from determining whether continued enrollment in school free from arbitrary state action is protected by substantive due process, and has instead assumed *arguendo* that such a substantive right exists in cases involving college students who challenge academic dismissals from state universities.  *See e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222–23 (1985) (assuming substantive due process protected a university student's right to continued enrollment but finding actions taken by university officials were not arbitrary); *Bd. of Curators v. Horowitz*, 435 U.S. 78, 91–92 (1978) (assuming a university student could challenge an arbitrary or capricious academic decision but finding actions by university officials were not arbitrary).  Moreover, although the Supreme Court has held that a high school student is entitled to procedural due process in pursuit of a free public

education, the high Court has also held that a high school student's right to attend public school is not a "fundamental right" for purposes of substantive due process. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–37 (1973). The Sixth Circuit has also indicated that a public high school student's right to attendance is not a fundamental right. *See Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (analyzing whether discipline imposed upon a high school student was not rationally related to an offense instead of strictly scrutinizing the imposition of that discipline pursuant to a substantive due process analysis). A university student may arguably have an even lesser claim to substantive due process protection than a high school student. *See Rogers v. Tenn. Bd. of Regents*, 273 F. App'x 458, 462–463 (6th Cir. 2008) (affirming grant of summary judgment on a university student's claim that her academic expulsion for performance problems and inappropriate clinical behavior violated her substantive due process rights); *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 436−37 (6th Cir. 2006) ("[t]he interests [of a college student] protected by substantive due process are of course much narrower than those protected by procedural due process."); *Bell v. Ohio State Univ.*, 351 F.3d 240, 251 (6th Cir. 2003) ("[w]here . . . there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical education is protected by substantive due process.").

The Court applies this reasoning here. There is no dispute that Plaintiff was not currently enrolled as a student, nor had he applied, however, he was taking an online class which formed the basis for OSU's application of the Student Code of Conduct against him. Further, John Doe has expressed his desire to reenroll at OSU in the future. (Doc. 36, Am. Compl. ¶ 215). Regardless of whether Plaintiff was a current student, or had a desire to reenroll as a student at

OSU, Plaintiff's interest in continuing his education is not, as a matter of law, a fundamental

right protected by due process.

Plaintiff also alleges that he has a constitutionally protected liberty interest.  Specifically,

Plaintiff claims that because his OSU transcript will reflect a dismissal, even though he had

already graduated, his "reputation and standing" have been effected and that, because of that

harm, he may lose other "educational and employment opportunities" in the future.  (Doc. 36,

Am. Compl. ¶¶ 204–205, 224).  The United States Supreme Court in *Goss v. Lopez*, 419 U.S.

574–75, held that an enrolled student in a public school potentially suffers a reputational

injury—effecting a "liberty" interest—upon the imposition of a lengthy suspension from school.

Since *Goss*, Courts have further defined the necessary elements that a Plaintiff must demonstrate

in order to make a due process claim based upon a "liberty" interest in one's "reputation, good

name, honor or integrity. . . ."  *Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F. 3d 404, 410

(6th Cir. 1997).  In order to state a due process "liberty" claim for reputational harm, "a plaintiff

must show [five factors]."  *Quinn v. Shirey*, 293 F. 3d 315, 320 (6th Cir. 2002); *see also Greer v.

Detroit Public Schools*, 507 F. App'x. 567, 573 (6th Cir. 2012).  First, the reputational harm or

"stigmatizing statements" must occur in connection with "the loss of a governmental right,

benefit, or entitlement."  *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993); *see also Med

Corp., Inc. v. City of Lima*, 296 F.3d 404, 414 (6th Cir. 2002).  There exists no constitutional

liberty interest in one's reputation alone.  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  Second,

the plaintiff must demonstrate that the alleged reputational injury forecloses "his freedom to take

advantage of other employment [or educational] opportunities."  *Ludwig*, 123 F.3d at 410.

Third, the statements, findings or charges alleged to have caused reputational harm "must be

made public." *Id*.  Fourth, "the plaintiff must claim the charges made against him were false." *Id*.  Last, the public dissemination of the findings or charges "must have been voluntary."  *Id*.

Plaintiffs Amended Complaint fails to state a claim which meets "all five factors."  First, Plaintiff cannot demonstrate element one, which requires that the reputational harm occur in conjunction with "the loss of a government right, benefit, or entitlement."  John Doe did not suffer the loss of any government right, benefit, or entitlement because he was neither an enrolled student at OSU, nor did he have an application for admission to OSU pending.  In addition, even if he was an enrolled student, no court has recognized a liberty interest in this context, because, outside of governmental employment, the plaintiff must demonstrate that the governmental right of which he was "deprived" arose from a statute—and there exists no statutory right to be a student at a public university.  *See Doe v. Alger*, 145 F. Supp. 3d 646, 658–60 (W.D. Va. 2016) (holding that an enrolled student at a public university who is dismissed for disciplinary reasons possesses no constitutionally-protected liberty interest (citing *Paul v. Davis*, 424 U.S. 693 (1976)).

Second, Plaintiff does not allege that the charges against him or the adjudication of his claims have been "made public" by OSU as a result of a "voluntary" public dissemination.  An essential element of a reputational harm due process claim is that the governmental entity involved voluntarily makes the charges or findings public—as opposed to the entity being compelled by law to make the information public.  *Med Corp, Inc*., 296 F.3d at 414–15; *Mertik*, 983 F. 2d at 1363 (voluntary public disclosure found where employees provided unsolicited information to several members of the public that plaintiff was "banned" from skating rink because of sexual misconduct).  Plaintiff's only allegations regarding this element are that a

potential future employer or future educational institution could find out about the disciplinary action against Doe at some point in the future. (Doc. 36, Am. Compl. ¶¶ 136, 191, 204, 205).

Plaintiff has failed to satisfy at least four of the five required elements to maintain a claim for a liberty interest based on reputational harm, therefore, he has failed to demonstrate any protected life, liberty, or property interests upon which to base his claims for violation of procedural and substantive due process under 42 U.S.C. § 1983.

Even if Plaintiff could satisfy the requirement that he has been deprived of a life, liberty, or property interest, Defendants argue that he still fails to sufficient allege a claim for substantive or procedural due process because Plaintiff received more process than he was constitutionally due. The Court will discuss the specific claims of substantive and procedural due process in turn.

### 2. Substantive Due Process

The Fourteenth Amendment to the United States Constitution forbids a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Claims arising from the substantive component of the due process clause fall into one of two categories. *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994); *Mertik v. Blalock*, 983 F. 2d 1353, 1367 (6th Cir. 1993). The first type is a claim that state action has violated a fundamental right. *Harris*, 20 F.3d at 1405. The second type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. *Mertik*, 983 F.2d at 1367. "The test for substantive due process claims of this type is whether the conduct complained of shocks the conscience of the court." *Id.* at 1367−68 (internal quotations and citations omitted).

### a.   Fundamental Rights Analysis

Substantive due process protects against government interference with fundamental rights unless that interference is narrowly tailored to serve a proper public purpose.  *Washington v. Glucksberg*, 521 U.S. 702, 720−21 (1997).  Fundamental rights and liberty interests are the type of rights that are so implicit in the concept of ordered liberty that "neither liberty nor justice would exist if they were sacrificed."  *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (overruled on other grounds by *Benton v. Maryland*, 395 U.S. 784 (1969)); *Doe v. Mich. Dept. of State Police*, 490 F.3d 491, 499–500 (6th Cir. 2007).  These fundamental rights, which are deeply rooted in this nation's history and tradition, include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion."  *Glucksberg*, 521 U.S. at 720 (citations omitted); *see also Doe*, 490 F.3d at 499–500.  "The Supreme Court has cautioned, however, that it has 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'"  *Doe*, 490 F.3d at 500, (quoting *Glucksberg*, 521 U.S. at 720).

Because Plaintiff John Doe's right to continue his education is not a fundamental right protected by substantive due process, as a matter of law, OSU's decision to permanently dismiss him from OSU and bar him from ever entering the university or any campus property in the future, is not subject to strict scrutiny.  *Glucksberg*, 521 U.S. at 728.  Instead, that decision will be upheld if it is rationally related to a proper public purpose.  *Valot v. S.E. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997); *H.M. v. Bd. of Educ. of King's Local Sch. Dist.*, No. 1:14-cv-64, 2015 WL 4624629, at *3 (S.D. Ohio Aug. 3, 2015) (Barrett, J.).  Here, Plaintiff alleges that his suspension was motivated by OSU's duty to prove to the Department of

Education that it is taking the hardline with respect to allegations of sexual assault/misconduct on campus.  Further, Plaintiff generally alleges throughout the complaint that OSU's disciplinary process was motivated by gender bias against men accused of committing these alleged sexual assaults.  Given that universities have an obligation to provide safe campuses and investigate these serious allegations, the Court cannot conclude that this constitutes an allegedly improper purpose.

### b.  Conduct Shocking to the Conscience

On the other hand, a crackdown or a punishment can be so excessive and extreme that it shocks the conscience.  Action by an executive government official that is conscience shocking or arbitrary violates the substantive due process clause.  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).  Nevertheless, "only the most egregious official conduct" violates substantive due process under this standard. *Id.* at 846.

The facts alleged by Plaintiff against the individual defendants simply do not meet this "shocks the conscience" test, even when all inferences are drawn in his favor.  There is no evidence that OSU's conduct was "inspired by malice or sadism" nor does it amount to a "brutal and inhumane abuse of official power."  *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (finding that student alleged that a high school principal's actions shocked the conscience when she alleged that the principal pushed down her hotel room door, maliciously threw her against a wall in anger, and slapped her during a field trip); *Rochin v. California*, 342 U.S. 165, 172 (1952) (overturning drug conviction where evidence was obtained by involuntarily pumping a suspect's stomach because such police conduct shocked the conscience); *Weyant v. Okst*, 101 F.3d 845, 856 (2nd Cir. 1996) (explaining that the behavior of prison guards who deliberately

39

ignore the medical needs of pretrial detainees might shock the conscience in violation of substantive due process).

After concluding that Plaintiff has not established infringement on a fundamental right, the Court assesses John Doe's substantive-due-process claim under the rational-basis standard. "In the context of school discipline, a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense." *Seal*, 229 F.3d at 575 (quoting *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989)) (internal quotation marks omitted). This is not a rare case. There exist many rational bases for OSU's investigation of John Doe and his alleged conduct: (1) the U.S. Department of Education's interpretation of Title IX that requires universities to investigate allegations that may implicate Title IX as found in the U.S. Dep't of Educ., Office of Civil Rights Dear Colleague Letter, dated April 4, 2011, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; (2) the instruction to university boards to "regulate . . . the conduct of the students . . . so that . . . the college or university may pursue its educational objectives and programs in an orderly manner" found in Ohio Revised Code § 3345.21; and (3) OSU's interest in providing a safe environment for all of its students, including taking seriously charges of sexual misconduct by one of its students.

Plaintiff has therefore failed to show an arbitrary deprivation of a constitutional right or a conscience-shocking government action and his claim for violation of his substantive due process rights must be dismissed.

### 3. Procedural Due Process

Plaintiff also alleges a § 1983 claim for violation of his procedural due process rights. The Sixth Circuit has explained that "[t]he Due Process Clause of the Fourteenth Amendment

prohibits States from depriving 'any person of life, liberty, or property, without due process of law.'" *Jaber v. Wayne State Univ. Bd. of Governors*, 487 F. App'x 995, 996 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1).  To establish a procedural due process violation, a plaintiff must establish a constitutionally protected property or liberty interest and show that the state deprived the plaintiff of such interest without appropriate procedures.  *See Rogers*, 273 F. App'x at 462 (citing *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 762 (6th 2005)).  "Property interests are not . . . defined by the Constitution." *Roth*, 408 U.S. at 577; *see also Horowitz*, 435 U.S. at 82.  "Rather, they are created and defined by 'existing rules or understandings that stem from an independent source such as state law . . . .'" *Roth*, 408 U.S. at 577.

As set forth above, it is not entirely settled in the Sixth Circuit as to whether a student's continued enrollment at a state university is an interest protected by procedural due process. *Compare McGee*, 167 F. App'x at 437 ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved.") *with Flaim*, 418 F.3d at 633 ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions.").  Even if the Court assumes that Plaintiff possessed such a right, the Amended Complaint does not allege that Plaintiff received insufficient due process.

Notice and opportunity to be heard remain the most basic requirements for procedural due process.  *Flaim*, 418 F.3d at 635; *see also Goss*, 419 U.S. at 579.  In this case, Plaintiff alleges that on November 20, 2014, he was informed that a complaint of sexual misconduct in violation of the Student Code of Conduct had been filed against him.  (Doc. 36, Am. Compl. ¶ 70).  He was subsequently notified via a letter from OSU's Office of Student Life.  (*Id*. at ¶ 71,

Ex. Q).  The letter directed John Doe to schedule a meeting with Defendant Smith, who was investigating the case.  On December 18, 2014, John Doe met with Defendant Smith and Brandon Gibbs, the Human Resources representative conducting the investigation on behalf of OSUWMC on December 18, 2014, and cooperated with the investigation into Jane Doe's allegations.  (*Id*. at ¶ 76, Ex. T).  On Friday, February 6, 2015, Defendant Smith sent John Doe a letter via e-mail notifying him of her determination that sufficient evidence existed to charge him under the Code of Student Conduct, and included a Charge & Process Form.  (*Id*. at ¶ 83, Ex. V). The Charge & Process Form gave John Doe five days to decide to accept responsibility for the charges, or not accept responsibility and request a hearing before the University Hearing Officer or the University Conduct Board.  (*Id.* at ¶ 84).  On February 9, 2015, John Doe returned the Charge & Process Form choosing not to accept responsibility for the alleged violations and requesting a hearing before the University Conduct Board.  (*Id*. at ¶ 84, Ex. V).

On February 19, 2015, OSU notified John Doe via email that his University Conduct Board Hearing would take place on Friday, March 6, 2015 at 8:00 a.m., and that Defendant Page would be the coordinator for the hearing.  (*Id*. at ¶ 92, Ex. X).  On February 27, 2015, he was notified that the hearing packet was available for review, that new evidence had been submitted since he last reviewed the file, and stated that he could schedule a time to review the file prior to the hearing.  (*Id*. at ¶ 93, Ex. Y).  John Doe reviewed the file and relevant text messages between Jane Doe and her friend were not in the file and Jane Doe's cell phone records were not in the file.  (*Id*. at ¶ 94).  On March 5, 2015, John Doe requested a one-week continuation of the hearing because of difficulty obtaining electronic evidence necessary for his defense, including phone and text records to demonstrate that he and Jane Doe had been in contact between late fall 2014 through spring 2015.  (*Id*. at ¶ 95).  Defendant Smith denied the request as being untimely

under Section 3335-23-09 of the Code of Student Conduct. On March 6, 2015, the University

Conduct Board Hearing was conducted. (*Id*. at ¶ 96). John Doe's attorney was permitted to

serve as his advisor, but was not permitted to "actively participate." (*Id*. (citing Doc. 36-2, Code

of Student Conduct at 8)).

Plaintiff has raised a number of challenges regarding OSU's disciplinary process,

including that the complaint filed against him was not timely (filed after the six month time limit

for filing complaints); he was not provided a summary of the testimony of the witnesses to be

used against him; that Jane Doe's friends offered hearsay testimony; permitted Jane Doe to

present character witness testimony but denied the same to John Doe; and that OSU refused to

submit John Doe's evidence as part of the file, which included photographs, text messages, and

cards demonstrating the couple's ongoing relationship. (*Id*. at ¶¶ 74, 99–102).

Defendants argue, and the Court agrees, that "[i]t is not the role of the federal courts to

set aside decisions of school administrators which the court may view as lacking in wisdom or

compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975). It is the court's role to determine

whether the student received sufficient notice and a hearing regarding the charges against him.

"[I]n determining the amount of process due, courts are to look at three factors: (1) the nature of

the private interest affected—that is, the seriousness of the charge and potential sanctions, (2) the

danger of error and the benefit of additional or alternate procedures, and (3) the public or

governmental burden were additional procedures mandated." *Flaim,* 418 F.3d at 635.

"A university is not a court of law, and it is neither practical nor desirable it be one." *Id.*

at 635 n.1 (quoting *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 16 (D. Me. 2005)).

"Before expelling a student for disciplinary reasons, a public institution must provide: 1) notice

of the charges against the student; 2) an explanation of the evidence that authorities have against

the student; and 3) an opportunity for the student to present his side of the story." *Ashiegbu v. Williams*, 129 F.3d 1263, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997) (table) (citing *Goss*, 419 U.S. at 581); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927 (6th Cir 1988)).  The United States Supreme Court has held that the student is entitled to "some kind of notice" and "some kind of hearing." *Goss*, 419 U.S. at 579.  Once the student has been provided notice and a hearing, but protests the school's decision, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

Plaintiff has not alleged that he did not receive sufficient notice of the hearing, or that the investigation and hearing were not adequate.  Rather, Plaintiff summarized his procedural due process claims as follows:

> 1. Violated Section 3335-23-10 of OSU's Code of Student Conduct's ("COC") fairness requirement by allowing the "discipline of John Doe [to be] corrupted by gender based bias which resulted in his being denied a "fair and impartial" disciplinary proceeding. . . ." *Doc.38,* p.2287, ¶88;

> 2. Deprived John Doe of a fair and impartial hearing by "prohibit[ing] John Doe from accessing information necessary for his defense and/or internal appeal." *Id,* p.2316, ¶195;

> 3. Allowed Smith to engage in a gender biased "investigation" which was "then provided to the Hearing Panel." *Id.,* p.2321, ¶2250(a);

> 4. Denied John Doe a "adequate, reliable, and impartial investigation" by ignoring Department of Justice ("DOJ") conflict of interest directives by allowing Smith to serve as "investigator, prosecutor, and judge" of John Doe. *Id.,* p.2286-87, ¶86-87;

> 5. Prejudiced John Doe by withholding a "summary of the testimony of witnesses to be used against him." *Id.,* p.2290, ¶99;

6. "[P]ermitted the use of hearsay evidence at the Hearing without providing John Doe with the opportunity to effectively cross-examine witnesses." *Id.*, p.2321, ¶225(b);[12]

7. Allowed the Hearing Panel to receive "an impact statement from [Jane Doe] before" determining if John Doe should be found responsible for violating OSU's COC. *Id.*, ¶225(c);

8. Failed to "apply [] OSU rules properly, including the definition of consent" set forth in the COC (and) not applying "the appropriate definitions of key legal terms." *Id.*, pgs.2287, 2322, ¶¶89, 225(d);

9. Denied John Doe "effective assistance of an attorney or other advisor" because his "advisor was not permitted to [fully] participate" at his disciplinary hearing. *Id.,* p.2322, ¶225(e);

10. Prohibited John Doe from raising "bias concerns regarding . . . [OSU] employees that would sit on his Hearing Panel . . . ." *Id,* p.2288, ¶90;

11. Failed to afford John Doe a presumption of innocence. *Id.,* p.2322, ¶225(f);

12. Infringed on "John Doe's protected property interest . . . (and) right to pursue an education and future educational and employment opportunities and occupational liberty." *Id,* p.2315, ¶191;

13. Engaged in "ill will, bad faith, and/or an intent to injure John Doe . . . [which amounts to] the arbitrary abuse of executive power so egregious that it shocks the conscience of the public." *Id,* p.2316, ¶197-98 (discussing publications addressing Constitutional violations similar to those Individual Defendants' inflicted on John Doe);

---

[12]  "*See e.g., Brandeis,* 2016 U.S. Dist. Lexis 43499, *13-14 (discussing a lack of cross-examination in a university disciplinary hearing as follows: [h]ere, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence. The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding."). Similarly, the Second Circuit's *Winnick* decision noted: "if this case had resolved itself into a problem of credibility, crossexamination of witnesses might have been essential to a fair hearing." *Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir. 1972). *See also, Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005)(citing *Winnick* for the proposition that "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases."). Therefore, John Doe requests this Court reject State Defendants' allegations that John Doe no right to question witnesses.  Doc.37, p.2845-47 (containing State Defendants' arguments regarding same)."  (Doc. 40, Pl.'s Resp. at 48, n. 42).

45

14. Denied "John Doe the 'fundamentally fair [disciplinary] procedures' required by United States Supreme Court decisions such as *Goss v. Lopez*, 419 U.S. 565 (1975)." *Id.*, p.2315, ¶190;

15. Unlawfully hindered "John Doe's right to pursue an education and future educational and employment opportunities and occupational liberty. *See e.g., Dixon v. Alabama State Board of Education*, 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S. Ct. 368, 7 L.Ed.2d 193 (1961)(stating, ' . . . . education is vital and, indeed, basic to civilized society . . . [i]t is most unlikely that a public college would accept a student expelled from another public college . . . .")." *Id.*, ¶191;

16. Denied John Doe his right to a "gender-neutral" disciplinary process by an "impartial decision maker." *Id.*, p.2315, ¶193;

17. Eliminated John Doe's right to "a 'meaningful' opportunity to clear his name. *See e.g., Matthews v. Eldridge,* 492 U.S. 319, 333 (1976)(requiring disciplinary procedures that take place 'at a meaningful time and in a meaningful manner.')." *Id.*, ¶194;

18. " . . . . irreparably damaged John Doe's 'good name, reputation, honor, or integrity' with an unlawful disciplinary proceedings that will 'seriously damage [his] standing . . . [and] interfere with later opportunities for higher education and employment.' *See, Goss v. Lopez*, 419 U.S. 565, 573-75 (1975)." *Id.*, p.2305, ¶136;

19. Deprived "John Doe of his interests within the meaning of 'life, liberty, or property' contained in U.S. Const. . . . in part because Defendants violate[d] John Doe's property right to a transcript unmarred by Defendants' unlawful investigation and/or discipline of John Doe." *Id.*, p.2317, ¶205; and

20. Violated John Doe's rights under the Ohio Constitution and Ohio's Administrative Code. *See e.g., Id.,* pgs.2320-21; ¶¶219-223.

(Doc. 40, Pl.'s Resp. at 47–49).

Although the Court finds all of Plaintiff's allegations concerning, he has not alleged that

he did not receive notice or a hearing. He was further provided with the charges against him and

potential sanctions. He also had the opportunity to review the hearing packet prior to the hearing

and was allowed to participate in the hearing. Further, OSU's decision to not allow his attorney

to act on his behalf has not been found to violate due process. *See Flaim*, 418 F.3d at 640–41

("Full-scale adversarial hearings in school disciplinary proceedings have never been required by

the Due Process Clause and conducting these types of hearings with professional counsel would entail significant expense and additional procedural complexity.").  Plaintiff's allegation that OSU failed to follow its own procedural guidelines and that said failure resulted in an unfair disciplinary process is of some concern.  (Doc. 40, Pl.'s Resp. at 63).  However, in *Winnick v. Manning*, the Second Circuit held that "we are not inclined to hold that every deviation from a university's regulations constitutes a deprivation of due process."  460 F.2d 545, 550 (2d Cir. 1972).  Just as the *Winnick* court didn't find that the alleged deviations rose to "constitutional proportions," this Court does not find Plaintiff's allegations to rise to that level.  Accordingly, Plaintiff's procedural due process is hereby dismissed.

### 4.  Equal Protection Clause

In Count Five, Plaintiff alleges a violation of the Fourteenth Amendment's Equal Protection Clause, pursuant to 42 U.S.C. § 1983, asserting generally that "gender discrimination caused the Individual Defendants to unlawfully find John Doe responsible for engaging in sexual misconduct with Jane Doe.  Upon information and belief, female OSU students suffer no historical disadvantage regarding the discernment of consent to intimate physical relationships with male students which would allow Individual Defendants to validly discriminate against male students like John Doe."  (Doc. 36, Am. Compl. ¶ 212—213).  In order to state a claim for an equal protection violation based upon gender discrimination, Plaintiff must demonstrate that he was treated differently—under the same facts and circumstances—than a member of the opposite gender.  *Kuhn v. Washtenaw Cty.*, 709 F. 3d 612, 624 (6th Cir. 2013).  The Sixth Circuit has held that is an "absolute requirement" to state an equal protection claim that the plaintiff provide evidence "that a similarly situated person outside [his] category" was either not charged with misconduct or not dismissed from the university under the same set of operative facts.

*Gardenhire v. Schubert*, 205 F. 3d 303, 318 (6th Cir. 2000); *see also Harajli v. Huron Twp.*, 365 F 3d 501, 507 (6th Cir. 2004).

Defendants argue, and the Court concurs, that Plaintiff's Amended Complaint does not include an example of a female student who was accused by another student of sexual misconduct under the same facts, yet was either found not responsible or was not dismissed from OSU.  Plaintiff therefore cannot maintain a claim for violation of the equal protection clause and Count 5 is hereby dismissed.

### 5.  Qualified and Eleventh Amendment Immunity for the Individual Defendants

The individual Defendants also assert that they are entitled to qualified immunity on Plaintiff's claims against them in their individual capacities, and to Eleventh Amendment immunity for claims against them in their official capacities.  Having found that all of the claims against the Individual Defendants as set forth in detail above are dismissed, the Court need not address the Individual Defendants' immunity arguments.

## C.     Declaratory Judgment and Injunctive Relief

Plaintiff has also sought a request for declaratory judgment (Count 8) for violation of the due process provisions of the United States and Ohio Constitutions.  (Doc. 36, Am. Compl. ¶ 66).  The Court has already determined that Plaintiff has failed to state a claim for relief under the due process clause.  Without an actionable claim, there is no controversy to be settled.  *See Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (declaratory judgment act does not create an independent cause of action); *Snyder Comput. Sys. v. Lahood*, No. 2:10-cv-161, 2010 WL 3167851, at *3–5 (S.D. Ohio Aug 10, 2010 (Sargus, J.) (dismissing plaintiff's request for declaratory judgment because underlying procedural due process claim failed).  Plaintiff's

request for a declaratory judgment for violation of the due process provisions is hereby dismissed.

Throughout the Amended Complaint, Plaintiff generally requests injunctive relief. Injunctive relief is a remedy, not a cause of action.  *Reyes v. Wilson Mem. Hosp.*, 102 F. Supp. 2d 798, 801 n. 1 (S.D. Ohio 1998) (Rice, J.).  Plaintiff has not specifically sought injunctive relief with respect to Count 3, the remaining claim in this case and all other claims have been dismissed.  Therefore, any request for injunctive relief is denied.

### IV.    CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff's claim for erroneous outcome in violation of Title IX against OSU remains pending.  All of Plaintiff's other claims are hereby dismissed.  Defendants' Motion to Strike the Amended Declaration of Joshua Engel is **DENIED**.

The previously filed motions to dismiss and motion to strike with respect to the Second Amended Complaint, documents 23, 24, and 25 are hereby **DENIED as moot**.

The Clerk of this Court shall remove Documents 23, 24, 25, 37, and 38 from the Court's pending motions list.  The Clerk shall dismiss the Individual Defendants from this case as there are no remaining claims pending against each of them.

IT IS SO ORDERED.

 *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**